# UNITED STATES DISTRICT COURT

## DISTRICT OF MAINE

| | | |
|---|---|---|
| **GEORGE J. MARCUS AND MARCUS, CLEGG, BALS & ROSENTHAL, P.A.,** | ) ) ) | |
| **PLAINTIFFS/ COUNTERCLAIM DEFENDANTS** | ) ) ) | |
| **v.** | ) ) | **CIVIL NO. 2:18-CV-253-DBH** |
| **ALLIED WORLD INSURANCE COMPANY,** | ) ) ) ) | |
| **DEFENDANT/ COUNTERCLAIM PLAINTIFF** | ) ) | |

## DECISION AND ORDER ON CROSS-MOTIONS FOR SUMMARY JUDGMENT

This litigation concerns the scope of an insurer's duty to defend a lawyer and his law firm in two lawsuits. The underlying lawsuits are an SEC enforcement action against the lawyer and several other defendants for violating federal securities laws, and a private class action against the lawyer and his law firm in which investors seek damages. The primary issues involve interpretation of a lawyers' professional liability (LPL) policy—specifically, whether the SEC's requested disgorgement from the lawyer is a covered claim under the policy; whether the policy's investment advice exclusion bars coverage for both lawsuits; and the effect of a related claims provision.

I conclude that the insurer has no duty to defend the SEC lawsuit because disgorgement is a penalty not covered under the policy, but that the insurer does

have a duty to defend the private class action notwithstanding the policy's investment advice exclusion.

## PROCEDURAL HISTORY

### *First Claim*

On March 30, 2018, the SEC filed a complaint against the defendant, Attorney George Marcus, and others in this court, <u>Securities and Exchange Commission v. Michael A. Liberty, et al.</u>, Case No. 18-139 (D. Me.). That lawsuit asserts that along with others, Attorney Marcus—who for years represented Michael Liberty and some of his businesses (including corporate defendants in the SEC lawsuit)—violated the federal Securities Acts through a deceitful investment scheme involving fraudulent securities offerings. The SEC seeks an injunction, disgorgement of "ill-gotten gains," and a civil monetary penalty under the Securities Act. Marcus's insurer, Allied World Insurance Company (Allied World), has denied any coverage or duty to defend Marcus in the SEC lawsuit.[1]

When Allied World refused to defend Marcus, Marcus filed this federal declaratory judgment complaint in June 2018 seeking a defense. Compl. ¶¶ 29-38 (ECF No. 1). He also requested damages from Allied World for breach of the implied covenant of fair dealing and for unfair claims practices under Maine statutes. <u>See id.</u> at ¶¶ 39-42.

---

[1] Allied World earlier agreed that a tolling agreement between Marcus and the SEC on January 18, 2018, was covered, but otherwise reserved its right to contest coverage. <u>See</u> March 5, 2018 letter at 2-3 (ECF No. 30-9); <u>see also</u> Def.'s Statement of Add'l Material Facts ¶¶ 44-47 (ECF No. 30) (describing the letter); Pls.' Opp'n ¶¶ 44-47 (ECF No. 36) (qualifying defendant's description, but only to add a quotation from the letter). The policy has a specific provision that "a request to toll or waive a statute of limitations" is a claim. § III.C.4. Allied World also covered other earlier fees such as responding to subpoenas. Def.'s Statement of Add'l Material Facts ¶ 41; Pls.' Opp'n ¶ 41 (admitting defendant's assertion).

***Second Claim***

On August 22, 2018, two private plaintiffs sued Marcus and his law firm, Marcus, Clegg, Bals & Rosenthal, P.A., seeking to proceed as a class action.[2] <u>Tina A. Endicott, et al. v. George Marcus, et al.</u>, Case No. 18-331 (D. Me.) (the Endicott lawsuit). The complaint alleges that Marcus's and his firm's misconduct occurred both "within their legal practice" and "outside of their legal services," and that Marcus knowingly profited, through legal fees, from the fraudulent scheme that he helped Michael Liberty perpetrate. Endicott Compl. ¶¶ 4-5 (ECF No. 22-3). Specifically, the Endicott plaintiffs accuse Marcus and his law firm of "drafting . . . faulty and misleading legal documents"; of "negligent and improper handling of investor funds deposited in their law firm IOLTA account, in breach of their duties and in other instances outside of their legal services wherein Defendant Marcus became directly involved in the improper sale of securities"; of "misrepresentations and omissions of material facts to investors"; and of "misappropriation and misuse of the investors' funds." <u>Id</u>. ¶ 4. Allied World initially agreed to defend the Endicott lawsuit, but reserved its right to argue that it had no duty to defend or indemnify.

At a conference of counsel, I allowed the parties to amend their pleadings to encompass this second lawsuit. <u>See</u> Report of Pre-filing Conference under D. Me. L.R. 56 at 1 (ECF No. 20). They have done so. Allied World now denies any duty to defend either lawsuit, whereas Marcus and his law firm say Allied World

---

[2] A class has not yet been certified.

is obligated to defend both. All parties have moved for summary judgment. I heard oral argument on April 18, 2019.

**ANALYSIS**

Under Maine law, a duty to defend is determined by comparing the allegations of the complaints in the underlying lawsuits to the language of the policy. <u>Merrimack Mut. Fire Ins. Co. v. Brennan</u>, 534 A.2d 353, 354 (Me. 1987). Thus, on the interpretation issues concerning the duty to defend, there can be no facts in dispute. For some collateral issues concerning Count 2 and unfair claims practices, I examine the parties' statements and opposing statements of material facts and find no genuine issue of material fact to affect the outcome.

### *Insurance Policy Interpretation*

Maine law is clear that I first determine whether a claim is potentially covered under the insurance policy. For that decision, the burden is on the insured. <u>See</u> <u>York Golf & Tennis Club v. Tudor Ins. Co.</u>, 845 A.2d 1173, 1175 (Me. 2004). If I find potential coverage, then I consider any policy exclusion. For that decision, the burden is on the insurer. <u>Vermont Mutual Ins. Co. v. Ben-Ami</u>, 193 A.3d 178, 181 (Me. 2018).

### *1. SEC Lawsuit*

The Allied World LPL policy states that Allied World must "defend any Claim seeking Damages covered under this Policy." Policy § V.C.1. In its lawsuit, the SEC has asked that all defendants, including Marcus, "disgorge their ill-gotten gains, plus pre-judgment interest." SEC Compl. at 65 ¶ B. Marcus and

Allied World dispute whether the requested disgorgement is included within the policy's coverage of damages.[3]

According to the Allied World LPL policy:

> DAMAGES means the monetary portion of any judgment, award or settlement, including pre- and post-judgment interest.
>
> Damages shall not include:
>
> 1. criminal or civil fines, taxes, *penalties (statutory or otherwise)*, fees or sanctions;
> 2. punitive, exemplary or the multiplied portion of multiple damages;
> 3. amounts deemed uninsurable by law;
> 4. the return or restitution of legal fees, costs and expenses, no matter how claimed;
> 5. amounts paid or incurred by an Insured to comply with a judgment or settlement for any form of equitable or non-monetary relief; or
> 6. amounts incurred by an individual or entity providing support services to the Insured resulting from an interruption of such individual or entity's business operations.

Policy § III.G (emphasis added). The term in dispute is "penalties," and it is undefined.

The basis for the "ill-gotten gains" the SEC Complaint has attributed to Marcus is that "Marcus obtained money (in the form of legal fees) from the Defendants' fraudulent misrepresentations and omissions in the course of the securities offerings . . . ." SEC Compl. ¶ 18. But covered damages under the

---

[3] Marcus does not argue that the SEC's requested relief of an injunction or a civil monetary penalty is covered, see Pls.' Mot. for Summ. J. at 12 (ECF No. 27), and the policy language is clear that such relief is not covered. The conventional conclusion in the SEC complaint's prayer for relief ("such other and further relief as the Court deems just and proper") does not create coverage. York Golf & Tennis Club v. Tudor Ins. Co., 845 A.2d 1173, 1177 n.1 (Me. 2004). This is not a case like Harlor v. Amica Mut. Ins. Co., 150 A.3d 793, 799-800 (Me. 2016), where the complaint's allegations would support an award of money damages even though not explicitly requested.

policy expressly do <u>not</u> include "the return or restitution of legal fees, costs and expenses, no matter how claimed," Policy § III.G.4, so the requested disgorgement of Marcus's legal fees alone would not generate a duty to defend.[4] Marcus argues that Allied World nevertheless must defend him here because, under SEC disgorgement principles, there is "a possibility that Mr. Marcus, if found liable, could be held jointly and severally liable for amounts far exceeding his attorney's fees." Pls.' Mot. for Summ. J. at 16 (ECF No. 27) (in other words, for amounts that *other* defendants may have fraudulently gained). The United States Supreme Court recognized that possibility in 2017, saying that disgorgement "sometimes exceeds the profits gained as a result of the violation," <u>Kokesh v. Securities & Exchange Comm'n</u>, 137 S. Ct. 1635, 1644 (2017). In this opinion, I will call that kind of disgorgement "excess disgorgement."[5] Allied World has not disputed that excess disgorgement could occur, but says that form of disgorgement fits within "penalties" that are not included in LPL damages coverage and that it therefore has no duty to defend the SEC lawsuit.

I have looked for cases interpreting use of the term "penalties" before Marcus and Allied World executed the policy (and before <u>Kokesh</u> was decided).[6] The cases I have found do not agree on whether the term is ambiguous.[7] In

---

[4] At oral argument, Marcus's lawyer emphasized as part of her case for coverage that Allied World could have, but did not, list disgorgement as excluded from damages. With respect to disgorgement of Marcus's legal fees, however, Allied World did so in the words I have quoted in text.

[5] I do not mean that it is *excessive* disgorgement, only that it exceeds the wrongdoer's actual gain.

[6] The parties did not cite pre-<u>Kokesh</u> cases interpreting this kind of language.

[7] <u>Compare</u> <u>S.E.C. v. Graham</u>, 823 F.3d 1357, 1361 (11th Cir. 2016) ("Ordinary meaning of 'penalty' is unambiguous" for statute of limitations purposes); <u>Wellcome v. Home Ins. Co.</u>, 849 P.2d 190, 193 (Mont. 1993) (policy language "fines" "is not ambiguous and excludes coverage for the sanctions imposed by the state trial court"; policy language "statutory penalty" was not the

determining whether court-imposed sanctions or a statutory surcharge fit within the "penalties" exception to coverage,[8] the courts generally focus on whether the remedy is punitive or compensatory.[9]

I have found no cases dealing with whether SEC excess disgorgement is excluded from LPL policy coverage as a penalty. The Restatement (Third) of Restitution & Unjust Enrichment (2011) speaks of disgorgement. It says: "The object of restitution in such cases is to eliminate profit from wrongdoing while avoiding, so far as possible, the imposition of a penalty." § 51(4). "The profit for which the wrongdoer is liable by the rule of § 51(4) is the net increase in the assets of the wrongdoer, to the extent that this increase is attributable to the underlying wrong." Id. § 51 cmt. e. The Restatement does not consider "disgorgement of wrongful gain" to be "a punitive remedy" because "the wrongdoer who is deprived of an illicit gain is ideally left in the position he would

---

basis for the sanction, but "that language would include penalties of all kinds imposed under authority of statue or rule, including a criminal fine, an 'excess costs' penalty . . ., a statutory contempt, or a sanction imposed under the Montana Rules of Civil Procedure"), with Carey v. Employers Mut. Cas. Co., 189 F.3d 414, 421 (3d Cir. 1999) (fines and penalties exclusion "does not unambiguously exclude the surcharge"); Collins & Aikman Corp. v. Hartford Acc. & Indem. Co., 436 S.E.2d 243, 247 (N.C. 1993) ("'penalty' as used in the policy is at best ambiguous"); O'Connell v. Home Ins. Co., 1990 WL 137386 at *3, *5 (D.D.C. 1990) (policy language excluding "fines or statutory penalties whether imposed by law or otherwise" "is ambiguous as to whether Rule 11 sanctions are excluded from the Policy coverage"). One commentator has said that a fines or penalties policy exclusion is not "facially ambiguous" but that if on the facts the remedy is "more compensatory in nature, courts tend to find the exclusion ambiguous and rule in favor of the insured." Andrew Jayne, "Fines or Penalties' Exclusions in Professional Liability Policies" (Oct. 2017), available at https://www.okbar.org/barjournal/oct2017/obj8827jayne/.

[8] See, e.g., Animal Fdn. v. Philadelphia Indemnity Ins. Co., 2013 WL 12141485, at *6 (D. Mont. 2013) (court-imposed sanction qualifies as a civil penalty excluded from coverage under insurance policy); O'Connell, 1990 WL 137386, at *5 (sanctions are covered); Collins & Aikman, 436 S.E.2d at 247 (punitive damages not excluded from coverage as a "penalty"); Carey v. Employers Mut. Cas. Co., 189 F.3d 414, 420 (3d Cir. 1999) ("surcharge is not punitive but remedial").

[9] See, e.g., Carey, 189 F.3d at 419 ("an exclusion for fines and penalties, where those terms are undefined in the policy, allows an insurer to deny coverage when the item to be covered is punitive, rather than merely compensatory"). See also Andrew Jayne, supra n.7.

have occupied had there been no misconduct." Id. § 51 cmt. k. Those statements do not seem apt for recovery of amounts beyond the wrongdoer's gain like the excess disgorgement the SEC may obtain against Marcus. The Restatement recognizes that sometimes the goal of deterrence requires going beyond simple disgorgement and points, for example, to exemplary damages. Id. (discussing "punitive or exemplary" damages). The potential remedy in the SEC lawsuit here—excess disgorgement beyond Marcus's legal fees—is a demand by a government agency that would not merely eliminate Marcus's allegedly ill-gotten gains, but would also force Marcus to pay the SEC for gains that other defendants may have garnered.[10] In that respect, the requested relief operates as a punitive deterrent,[11] not compensation for an injured investor. Maine does not favor insuring against deterrent remedies. Braley v. Berkshire Mut. Ins. Co., 440 A.2d 359, 361-62 (Me. 1982) (with respect to punitive damages, "[a]llowing punitive damages to be awarded against an insurance company can serve no deterrent function because the wrongdoer is not the person paying the damages"). I conclude that the term "penalties" is not ambiguous, but even if it

---

[10] In fact, the SEC has enforcement purposes that go beyond seeking relief for defrauded investors; it also seeks to deter misconduct through penalties. See Steven Peikin, "Remedies and Relief in SEC Enforcement Actions" (Oct. 3, 2018), *available at* https://www.sec.gov/news/speech/speech-peikin-100318 (last visited Apr. 23, 2019); see also Kokesh, 137 S. Ct. at 1644 (internal citations and quotations omitted): "Even though district courts may distribute the funds to the victims, they have not identified any statutory command that they do so. When an individual is made to pay a noncompensatory sanction to the Government as a consequence of a legal violation, the payment operates as a penalty."

[11] The D.C. Circuit has recognized the deterrent purpose of disgorgement in the context of joint and several liability like that sought here. S.E.C. v. Whittemore, 659 F.3d 1, 11 (D.C. Cir. 2011).

were ambiguous and I construed it against Allied World, excess disgorgement nevertheless fits squarely within its scope.[12]

Kokesh, decided just after this policy went into effect, confirms my conclusion that SEC excess disgorgement relief is a penalty under the LPL policy. Marcus correctly points out that Kokesh was interpreting, not an insurance policy, but a federal statute of limitations that established a 5-year limitations period for the SEC to seek a penalty. Id. at 1642 & n.3. Certainly the 2017 Kokesh decision is not determinative of what the Allied World LPL policy meant when the parties agreed to its language earlier, but it is instructive because Kokesh's reasoning is broad and persuasive. Kokesh concluded that SEC disgorgement is a penalty under the statute of limitations because: (1) it is imposed for a violation "against the United States rather than an aggrieved individual," id. at 1643; (2) it "is imposed for punitive purposes," id.; and (3) in many cases it is not compensatory, id. at 1644. (In Kokesh, the fact that disgorgement "sometimes exceeds the profits gained as a result of the violation," id., as Marcus has argued that it may here, demonstrated that disgorgement "is a punitive, rather than a remedial, sanction," id. at 1645.) Those principles for determining what is a penalty were not invented out of whole cloth in Kokesh, and they are pertinent here. The SEC seeks disgorgement from Marcus for violating United States securities laws (factor 1); disgorgement against Marcus

---

[12] I note by way of context that the "penalties" that the Allied World policy says it does not cover as damages are one of a list of uncovered remedies in § III.G that go beyond compensatory damages (e.g., fines; taxes; penalties; fees; sanctions; punitive, exemplary or multiple damages; return or restitution of legal fees; and amounts paid to comply with a judgment for equitable relief).

beyond his legal fees would be imposed for punitive purposes (factor 2); it is not compensatory (factor 3); and disgorgement may exceed any profits Marcus gained. Thus, <u>Kokesh</u> confirms my conclusion that excess disgorgement is a penalty.[13] Marcus has not shown that Allied World has a duty to defend him in the SEC lawsuit.[14]

### 2. *Endicott Lawsuit*

Allied World concedes that the Endicott complaint presents a claim that is within the potential coverage of the policy. Def.'s Reply to Pls.' Opp'n to its Mot. for Summ. J. (Def.'s Reply) at 6-7 (ECF No. 43); Def.'s Cross-Mot. for Summ. J. & Opp'n to Pls.' Mot. for Summ. J. (Def.'s Cross-Mot.) at 20 (ECF No. 29). That is unremarkable, because Maine law says that the "rules of notice pleading favor a broad construction of the duty to defend," <u>Harlor v. Amica Mut. Ins. Co.</u>, 150 A.3d 793, 797 (Me. 2016) (quoting <u>York Golf & Tennis Club v. Tudor Ins. Co.</u>,

---

[13] The only case interpreting "penalty" in an LPL policy after <u>Kokesh</u> is a decision from a New York intermediate court, reaching the same conclusion I do. <u>J.P. Morgan Securities, Inc. v. Vigilant Ins. Co.</u>, 2018 WL 4494692 (N.Y. App. Div. 2018). I note the following about other trial court cases the parties have cited. In general, they are concerned with whether the SEC has the power to seek disgorgement under equitable principles now that the Supreme Court has characterized it as a penalty for statute of limitation purposes. Those cases conclude that the long-recognized disgorgement power continues to exist, and point to the footnote in <u>Kokesh</u> that "[n]othing in this opinion should be interpreted as an opinion on whether courts possess authority to order disgorgement in SEC enforcement proceedings . . . ." 137 S. Ct. at 1642 n.3. <u>SEC v. Jammin Java Corp.</u>, 2017 U.S. Dist. LEXIS 157730 at *5 (C.D. Cal. 2017); <u>accord</u> <u>SEC v. Mapp</u>, 2018 U.S. Dist. LEXIS 125352 (E.D. Tex. 2018); <u>SEC v. Sample</u>, 2017 U.S. Dist. LEXIS 191025 (N.D. Tex. 2017). <u>SEC v. Brooks</u>, 2017 U.S. Dist. LEXIS 122377 (S.D. Fl. 2017), held that a disgorgement action can survive the defendant's death. In <u>SEC v. Flowers</u>, 2018 U.S. Dist. LEXIS 198088 (S.D. Cal. 2018), the defendants had agreed to disgorgement. <u>SEC v. Present</u>, 2018 U.S. Dist. LEXIS 45056 (D. Mass. 2018), does not help Marcus because there Judge Sarokin was deciding only whether <u>Kokesh</u> took away the power to order disgorgement (it did not) and he limited his holding to disgorgement that "merely restores a defendant to his original position without extracting a real penalty for his illegal behavior." <u>Id.</u> at *6 (internal citations omitted). Here, Marcus is seeking coverage on the basis that the disgorgement may exceed any profits he gained. That is part of what makes it a penalty.

[14] I do not address whether the investment advice exclusion, discussed next, would apply to the SEC lawsuit.

845 A.2d 1173 (Me. 2004)), and that it is a "'low' threshold," id. at 798 (quoting Irving Oil Ltd. v. ACE INA Ins., 91 A.3d 594, 599 (Me. 2014)). Here, the Endicott complaint clearly asserts legal malpractice against Marcus and his law firm and seeks money damages. See Endicott Compl. ¶¶ 9-20, 164.

But Allied World argues that specific language in its LPL policy excludes coverage. The exclusion at issue states:

> This Policy does not cover any Claim . . . based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving, in whole or in part:
> . . .
>
> 4. the alleged rendering of investment advice, including advice given by any Insured to make any investment or to refrain from doing so[.]

Policy § IV.B. "Investment advice" is undefined.[15]

The burden of proving that an exclusion applies lies with the insurer. Vermont Mut. Ins. Co., 193 A.3d at 181. If the exclusion is ambiguous, I must construe it strictly against the insurer. Patrons-Oxford Mut. Ins. Co. v. Dodge, 426 A.2d 888, 891 (Me. 1981); accord Restatement of the Law, Liability Insurance § 32, cmt. e (2018) (exclusions are "interpreted narrowly" and the burden is on the insurer).[16]

Nowhere does the Endicott Complaint allege that Marcus or his law firm rendered investment advice to the Endicott plaintiffs or advised them to make

---

[15] In an appendix, I briefly recount certain aspects of LPL drafting on this topic.

[16] The American Law Institute's 2018 Annual Meeting approved this new Restatement, with the Reporters to revise the text to implement the changes discussed and to make editorial and stylistic improvements. Those revisions and changes are reflected in Proposed Final Draft No.2-Revised. The Institute says that the latter may be cited as representing the Institute's position "until the official text is published." The American Law Institute, "The American Law Institute Approves Restatement of the Law, Liability Insurance (May 22, 2018), *available at* https://www.ali.org/news/articles/american-law-institute-approves-liability-insurance/ (last visited Apr. 23, 2019).

an investment or refrain from doing so.  The Complaint has numerous allegations about what Marcus allegedly did in drafting the documents and performing other services for Liberty and his companies, but I find no allegation that Marcus or his firm actually gave investment advice to the Endicott plaintiffs.  Paragraph 4 says that Marcus and his firm engaged both within their legal practice "and in other instances outside of their legal services wherein Defendant Marcus became directly involved in the improper sale of securities, misrepresentations and omissions of material fact to investors, and the misappropriation and misuse of the investors' funds."  Paragraphs 134 and 141 state that Marcus and his law firm

> substantially encouraged and assisted Liberty in connection with the false representations made to Plaintiffs and the putative class members in connection with the MDO Scheme.  Such assistance and encouragement—and in particular, Defendants' decision to allow Liberty to use Defendants' law firm IOLTA account as his personal bank account, and their decision to actively participate in the securities sales process including by discussing about the investment with investors—was a departure from the typical services offered by lawyers to clients.

These are troubling assertions, but they do not amount to an allegation that Marcus and his law firm rendered investment advice.  Paragraph 10 says that "Liberty with the help of Marcus and his associates went fishing for investors." That allegation is too vague to satisfy the investment advice exclusion. Paragraph 11 says that the third-party plaintiffs were told things "by Liberty, with the assistance of Marcus, as co-conspirator," that exaggerated the value of the investment.  See also Endicott Compl. ¶¶ 41, 45.  Misrepresentation that a lawyer makes on behalf of a client (Liberty) to third parties like the Endicott

plaintiffs may be actionable misrepresentation, but it is not by itself investment advice from the lawyer to those third parties. After all, lawyers regularly represent companies making a public stock offering, conducting a merger, or selling one company to another. "In the course of providing legal services to a client, a lawyer may be asked to investigate or analyze issues of fact or law and report the results to persons who are not clients." Restatement (Third) of the Law Governing Lawyers § 95 cmt. b (2000). Just because purchasers rely on those opinions in their decision to purchase does not mean that those lawyers are giving *investment advice* to the purchasers.[17]

Allied World's strongest argument to support application of the investment advice exclusion comes from ¶ 43 of the Endicott Complaint:

> And like with the First Rescission Offer, Marcus and his co-conspirators falsely and negligently misrepresented material facts to investors *to convince them* not to tender their securities in the Second Rescission Offer.

Id. (emphasis added). And in ¶ 45 the Complaint says:

> In connection with the Exchange Offer, Marcus and his co-conspirators falsely represented to investors that MDO had a value which exceeded $108 million, *thereby tricking investors* into accepting securities that were worth, at best, a fraction of the face value of the Mozido Invesco promissory notes.

Id. (emphasis added). These allegations are distressing and the conduct may be actionable if investors relied upon the alleged misrepresentations, but—contrary to Allied World's position at oral argument—they do not say that Marcus and his

---

[17] Indeed, in seeking to establish liability for fraud, the Endicott Complaint devotes an entire section to lawyers' obligations to *issuers*—not investors—in connection with securities offerings. Endicott Compl. ¶¶ 86-96.

firm gave *investment advice* to the Endicott plaintiffs and other investors, or that they advised them to make, or not to make, the investments (in the words of the policy exclusion, "advice . . . to make any investment or refrain from doing so"). Allied World cites two trial court cases that interpret the identical investment advice exclusion used by a related firm, Darwin Assurance Company, and find no duty to defend.[18]  But the allegations about attorney conduct in those cases were very different from what is alleged here.  Darwin Nat'l Assurance Co. v. Rosenthal, 2014 WL 12558837 (C.D. Cal. Sept. 24, 2014), involved a lawyer who was also a broker and, as a broker, solicited investments.  Christensen v. Darwin National Assurance Co., 2014 WL 1628133 (D. Nev. Apr. 14, 2014), involved a lawyer who advised his client to purchase the lawyer's personal home and other assets, and made stock trades on behalf of his client.  Both cases involved clear investment advice.  There are no such allegations in Endicott with which to accuse Marcus and his law firm of giving investment advice to the Endicott plaintiffs.  Moreover, one of the cases contains language adverse to Allied World's position here.  Christensen states: "the Investment Advice Exclusion concerns only situations in which a lawyer exceeds his or her role as a legal advisor by assuming the role of financial advisor as well."  2014 U.S. Dist. LEXIS 52069 at *16.  Nothing in the Endicott complaint suggests that Marcus and his law firm assumed the role of financial advisor.

---

[18] According to Allied World, "Allied World Assurance Company Holdings acquired Darwin Professional Underwriters, Inc. in October 2008."  Signorello Decl. Ex. C at 2 n. 1 (ECF No. 51-39).

I conclude that Allied World has not established that its investment advice exclusion applies. Allied World therefore has a duty to defend Marcus and his law firm in the Endicott lawsuit.

### 3. *Related Claims*

There is one more policy interpretation issue. Under a section titled "Notice of Claims and Circumstances," the Allied World LPL policy has a sub-subsection 5, captioned "Related Claims" that states:

> All Claims based upon or arising out of the same Wrongful Act or Related Act or Omission shall be considered a single Claim and shall be considered first made at the time the earliest Claim arising out of such Related Act or Omission was first made. In any such event, only one Limit of Liability and one Retention shall apply.

Policy § V.E.5. Marcus and his law firm argue that as a result of this provision, the SEC and Endicott lawsuits here must be considered a single claim. If I conclude that Allied World has a duty to defend Marcus and his law firm in the Endicott lawsuit (and I do), they argue that under the single-claim analysis, Allied World's duty to defend extends to the SEC lawsuit as well. They cite a Maine case where the Law Court noted that "in some circumstances the duty of an insurance company to defend one count in a lawsuit imposes a duty to defend all counts." Gibson v. Farm Fam. Mut. Ins. Co., 673 A.2d 1350, 1354 (Me. 1996).

Allied World agrees that the two underlying lawsuits "qualify as 'Related Claims.'" Def.'s Cross-Mot. at 3. But nothing in the quoted policy provision suggests that the provision affects anything other than determining the timeliness of notice, the insurance policy that applies, and the policy limits and

deductibles.[19]  Nothing suggests that it actually broadens the insurer's duty to defend by folding in a claim that is otherwise outside policy coverage.[20]  It may be intriguing to speculate whether the Law Court could be persuaded to expand its <u>Gibson</u> principle concerning the duty to defend an entire lawsuit to a situation like that here, involving two lawsuits, one covered and the other not.  But a federal court is not the place to seek such a dramatic extension of state law.[21]  <u>See, e.g.</u>, <u>Rared Manchester NH, LLC v. Rite Aid of New Hampshire, Inc.</u>, 693 F.3d 48, 54 (1st Cir. 2012) (citing concerns of both "prudence and comity" that "argue convincingly that a federal court sitting in diversity must hesitate to chart a new and different course in state law").

---

[19] According to 2011 Texas CLE materials discussing "related claims" provisions:

> When the claims being compared all arise within the same policy period the frequent effect of the provision is to limit the deductibles and limits of liability applicable to these related or consolidated claims. When related claims span policy periods, however, then the provision can operate to exclude the later claim because it relates back to a claim that was made within another policy period.

Nancy R. Kornegay and David H. Brown, "Purchasing Legal Malpractice Insurance: *The Form Matters!*" at 12 (2011), *available at* http://www.texasbarcle.com/Materials/Events/10357/137641_01.pdf (last visited Apr. 17, 2019); <u>accord</u> <u>Duckson v. Continental Cas. Co.</u>, 2015 WL 75262 at *8 (D. Minn. 2015) ("The purpose of the provision is to accumulate and determine the number and amount of deductibles and per claim policy limits that apply to a legal malpractice claim or lawsuit.  The related claims provision does not provide coverage for activities that would otherwise not be covered by the policy . . . .") (internal citations omitted).

[20] Allied World cites two trial court decisions where the courts refused to let such a provision *extend* a policy *exclusion* to a related claim:  <u>Carolina Cas. Ins. Co. v. Omeros Corp.</u>, 2013 U.S. Dist. LEXIS 38811 (W.D. Wash. March 12, 2013) and <u>Alanco Techs, Inc. v. Carolina Cas. Ins. Co.</u>, 2005 U.S. Dist. LEXIS 48104 (D. Ariz. May 18, 2005). Def.'s Cross-Mot. for Summ. J. & Opp'n to Pls.' Mot. for Summ. J. (Def.'s Cross-Mot.) at 27 (ECF No. 29).

[21] There are substantial differences between what Marcus advocates and <u>Gibson</u>'s statement that an insurer obligated to defend against one claim in a lawsuit has a duty to defend the entire lawsuit.  It would be cumbersome to have different defense lawyers for different counts in a trial.  That difficulty is not present in two different lawsuits.  There will of course be logistical and strategic issues: which lawsuit will proceed first?  The one proceeding first will probably incur the greater attorney fees and expenses in discovery.  Will there be collateral estoppel issues arising out of motion practice, trial or settlement in the first lawsuit?  That could lead the lawyers in the second lawsuit to seek involvement in the first lawsuit.  Ultimately, Allied World and its insureds may find it desirable to enter into a treaty arrangement on how to share responsibilities for defending the two lawsuits.

### 4. *Other Issues*

Because I conclude that Allied World has no duty to defend Marcus in the SEC lawsuit, and because it has been defending the Endicott lawsuit (albeit under a reservation of rights agreement[22]), I **GRANT** Allied World summary judgment on Count II of the Amended Complaint asserting a breach of the implied covenant of good faith and fair dealing, and violations of 24-A M.R.S.A. § 2436 (interest on overdue payments) and § 2436-A (unfair claims settlement practices).[23]

Because I conclude that Allied World does have a duty to defend Marcus and the law firm in the Endicott lawsuit, I **GRANT** the plaintiffs' motion for summary judgment on Allied World's counterclaim that seeks to recoup what it has paid in claim expenses in that lawsuit.

---

[22] At oral argument the plaintiffs' lawyer argued that the reservation-of-rights provision for recoupment of claims expenses in the Endicott lawsuit and Allied World's attempt to enforce it are actionable bad faith under the Count II claim. I do not find any Maine case that so holds, and the Restatement of the Law, Liability Insurance § 21, cmt. a (2018) states: "When an insurer's claim to recoupment is based on a contractual right to reimbursement—whether because of a provision of the insurance policy or a subsequent agreement with the insured—it presents no legal difficulty." Here, Allied World's reservation-of-rights letter had a recoupment provision and the plaintiffs did not reject it. See Sept. 28, 2018 letter at 2 (ECF No. 28-9); Def.'s Statement of Add'l Material Facts ¶¶ 50-51 (describing and quoting from the letter); Pls.' Opp'n ¶¶ 50-51 (qualifying paragraphs 50 and 51, but only to say that plaintiffs deny the legal validity of defendant's opinion as to the effect of its reservation of rights).

[23] I also note that the undisputed facts show that Allied World's notice of its coverage denial for the SEC lawsuit and its reservation of rights for the Endicott lawsuit were timely. Marcus gave Allied World notice of the SEC complaint on May 9, 2018. Allied World denied coverage May 10, 2018. Def.'s Statement of Add'l Material Facts ¶¶ 47-48; Pls.' Opp'n ¶¶ 47-48 (qualifying but not with respect to the asserted dates). The plaintiffs gave Allied World notice of the Endicott lawsuit September 4, 2018, and Allied World responded with its agreement to defend the lawsuit subject to its reservation of rights on September 28, 2018. Def.'s Statement of Add'l Material Facts ¶¶ 49-50; Pls.' Opp'n ¶¶ 49-50 (qualifying but not with respect to the dates). Those are reasonable response times under 24-A M.R.S.A. § 2436-A(1)(B).

**CONCLUSION**

In sum, as to the Amended Complaint Count I, both motions are **GRANTED IN PART AND DENIED IN PART**. As to Count II, the defendant's motion is **GRANTED** and the plaintiffs' motion is **DENIED**. As to the Counterclaim, summary judgment is **GRANTED** to the defendant and **DENIED** to the plaintiffs on Count I (the SEC claim[24]); **DENIED** to the defendant and **GRANTED** to the plaintiffs on Count II (the investment advice exclusion); **DENIED** to the defendant and **GRANTED** to the plaintiffs on Count III (the conversion/commingling exclusion[25]); and **DENIED** to the defendant and **GRANTED** to the plaintiffs on Count IV (the claim to recoup claim expenses already paid in the Endicott lawsuit).

Under 24-A M.R.S.A. § 2436-B(2), the plaintiffs are entitled to their legal fees and costs in establishing Allied World's duty to defend the Endicott lawsuit,

---

[24] There was some confusion at oral argument over claims expenses in the SEC lawsuit. Allied World's lawyer said defense fees had been paid up until the Complaint was filed (*i.e.*, Allied World agreed it was responsible for fees during the tolling period, but not for the recovery sought in the SEC lawsuit as it was ultimately filed). Marcus and his law firm's lawyer said that an amount was still outstanding. I assume the parties will resolve this confusion.

[25] In Count III of its Counterclaim, Allied World asserts that it has no duty to defend either lawsuit because of a "conversion/commingling exclusion" of the policy. Answer to Am. Compl. ¶¶ 65-72 (ECF No. 25). In my October 22, 2018 Order following a conference of counsel concerning summary judgment motions, I set February 8, 2019 as the deadline for all summary judgment motions. See Report of Pre-Filing Conference under D. Me. L.R. 56 at 2 (ECF No. 20). The plaintiffs then moved for summary judgment on all their claims and all Allied World's counterclaims. Allied World opposed the plaintiffs' motion for summary judgment and moved for summary judgment on its counterclaims, *but not including Count III.* Def.'s Cross-Mot. at 1. Moreover, in its briefing opposing the plaintiffs' motion for summary judgment, Allied World did not mention the conversion/commingling exclusion. The deadline for summary judgment motions has passed, and the duty to defend under Maine law is not determined by a factfinder, but "is a question of law." Harlor, 150 A.3d at 797 (internal citations omitted). Allied World's lawyer agreed at oral argument that it was no longer pressing the conversion/commingling exclusion argument in this duty-to-defend case. Accordingly, I conclude that Allied World has waived any argument that the conversion/commingling exclusion defeats its duty to defend.

but not for their fees and costs in seeking coverage of the SEC lawsuit.[26]  They shall file their request in accordance with the Local Rules.

It bears emphasizing that this decision deals only with the duty to defend and does not determine indemnification obligations, if any.

**SO ORDERED.**

**DATED THIS 23RD DAY OF APRIL, 2019**

/S/D. BROCK HORNBY
**D. BROCK HORNBY**
**UNITED STATES DISTRICT JUDGE**

---

[26] "In an action pursuant . . . to determine an insurer's contractual duty to defend an insured under an insurance policy, if the insured prevails in such action, the insurer shall pay court costs and reasonable attorney's fees."  24-A M.R.S.A. § 2436-B(2).

In the initial briefing on the cross-motions, Allied World asserted that investment advice exclusions are "common" in an LPL policy:

> The purpose of the Investment Exclusion, which is a common feature of lawyers['] professional liability policies, is self-evident and compelling. A lawyer who goes beyond her role as a lawyer by providing advice about investments is at grave risk of facing liability. Allied World (and other insurers) understandably do not agree to take on the risk of lawyers who go outside their professional role. Accordingly, the Investment Exclusion broadly bars coverage for any claim alleging that a lawyer provided investment advice, even if that advice is a small part of the overall claim.

Def.'s Reply at 8 n.5. Allied World also asserted that its particular investment advice exclusion is "broad." Def.'s Cross-Mot. at 21.[i] I understood that while standardized policies had developed in property and liability insurance underwriting for a variety of reasons, see Kenneth Abraham & Daniel Schwarcz, Insurance Law & Regulation: Cases & Materials 33-38 (2015), the Insurance Services Office (ISO) had stopped supporting a standardized lawyers' professional liability (LPL) policy in 2003. See 3 New Appleman on Insurance Law Library Edition § 25.07[2] nn. 321, 322 (2018).

Because Allied World's characterizations of its LPL policy were matters outside my knowledge, I asked the parties to submit more information about LPL policies to support or refute them. Procedural Order at 2 (ECF No. 49.) In doing so, I referred them to a web page that provided some LPL policies.[ii] From their responses I learned of more LPL policies and, in particular, that the National

---

[i] Later it said that its investment advice exclusion "is among the broadest on the market." Def.'s Response to Procedural Order at 3 (ECF No. 51).

[ii] Lawyers Insurance Group, "Legal Malpractice Insurance Policy," *available at* http://lawyersinsurer.com/legal-malpractice-insurance-policy/ (last visited Feb. 27, 2019).

Association of Insurance Commissioners maintains a System for Electronic Rates & Forms Filing (SERFF) where one can find on its website the policies approved for use in a particular state. For Maine it is https://filingaccess.serff.com/sfa/home/ME,[iii] and it shows 35 LPL policies other than that of Allied World. In addition, the ABA LPL Committee has a website that lists by category the carriers providing coverage in a state along with a summary of important provisions in their policies: https://www.americanbar.org/groups/lawyers_professional_liability/resources/lpl-insurance-directory/maine/.

From examining the available LPL policies and the cases, I conclude that the following generalizations are supportable: some LPL policies have no investment advice exclusion at all; some explicitly provide coverage for investment advice in connection with services such as that of trustee, executor, or fiduciary;[iv] some have an exclusion identical to or very close to that of Allied World; some make the exclusion seem narrower; and some explicitly define the term investment advice[v] (Allied World's policy does not).

A 2007 ABA publication alerted lawyers to check for investment advice exclusions in LPL policies. See ABA Standing Committee on Lawyers' Professional Liability, <u>Selecting Legal Malpractice Insurance</u> 3-4 (2007). In 2011, CLE materials on LPL policies for Texas lawyers stated: "Common exclusions

---

[iii] The LPL policies approved in Maine for the most part are those of companies that are also featured on the website in note ii, <u>supra</u>.
[iv] <u>See, e.g.</u>, <u>Pias v. Continental Cas. Ins. Co.</u>, 2013 WL 4012709 at *1 (W. D. La. 2013).
[v] <u>See, e.g.</u>, <u>Gonakis v. Medmarc Cas. Ins. Co.</u>, 722 Fed. Appx. 529, 534 (6th Cir. 2018) (defining the term).

. . . include . . . Service as a broker, realtor, dealer, investment or financial advisor, or accountant."  Nancy R. Kornegay and David H. Brown, "Purchasing Legal Malpractice Insurance: *The Form Matters!*" at 10 (2011), *available at* http://www.texasbarcle.com/Materials/Events/10357/137641_01.pdf (last visited Apr. 17, 2019).  After the Allied World LPL policy went into effect for Marcus and his law firm, a 2018 federal case stated:

> The existence of some attorney malpractice policies expressly providing coverage for investment advice and/or investment activities, and some policies expressly excluding coverage for the same, underscores the import of practitioners carefully choosing a liability policy.

ALPS Prop. & Cas. Ins. Co. v. Farthing, 2018 WL 4927366 at *13 n.18 (E.D. Va. Sept. 26, 2018).  That case also stated that an investment advice exclusion is "both familiar in the insurance industry and consistent with a common understanding of the conceptual difference between legal activities and investment activities," id. at *11, and that "recent case law suggests that malpractice insurers have shifted to squarely addressing such issue[s] through policy terms that either expressly exclude, or expressly provide, coverage for acts associated with investments."  Id. at 11 n.14 (citing cases for each alternative).

Thus, the initial Allied World assertions seem supportable.[vi]  But ultimately, I decide the dispute irrespective of whether Allied World's investment advice exclusion is common or unusually broad.[vii]

---

[vi] The plaintiffs agree that the Allied World exclusion, or at least Allied World's interpretation of its exclusion, is broad.  Pls.' Reply at 6 (ECF No. 35).

[vii] I have not considered, and the parties did not address, any relevance of the variety of LPL policies to the "penalties" provision of the Allied World policy.